HANLEY, RESPONDENT, v. GREAT NORTHERN RY. CO.,
APPELLANT.

(No. 5,036.)

(Submitted January 22, 1923. Decided February 24, 1923.)

[213 Pac. 235.]

*Personal Injuries—Railroads—Carrier and Passenger—Excessive Verdicts—Drawing Jury—Trial—Evidence—Motion to Strike—When Improper.*

Trial—Drawing of Jury—Improper Procedure.
  1. District courts may not arbitrarily draw a jury from box No. 3 or excuse jurors and thus bring about conditions under which the exercise of their discretion as to the use of box No. 3 may be invoked.

Same—Impaneling of Jury—Abuse of Discretion—Record on Appeal—Presumptions.
  2. The presumption being that official duty has been regularly performed, the supreme court must, in the absence of a proper record from which it can determine the question whether the trial judge abused his discretion in improperly drawing jurors from jury box No. 3, presume that he performed his duty in that respect in a proper manner.

Same—Striking Testimony—When Motion Too Late.
  3. Where a party sits by and permits improper testimony to be introduced without objection, and then without assigning any reason therefor asks to have it stricken, granting of the motion is error unless answers were made before counsel had an opportunity to object.

Appeal and Error—Amendment of Specification of Error—When Permissible.
  4. While allowance of amendment of a specification of error asked for at oral argument in the supreme court is not to be encouraged, where by the amendment the respondent is not in any manner prejudiced, his brief showing careful argument on the question as presented by the amendment, the amendment is permissible.

Personal Injuries—Excessive Verdict—New Trial.
  5. Evidence reviewed in an action for personal injuries claimed to have been sustained by plaintiff, a physician fifty-seven years of age at the time of an alleged collision between railroad trains of so slight a character that no one was jolted from his seat in the car or awakened by the impact, no one being injured except plaintiff, and *held* to show that a verdict for $15,000 was so excessive as to show passion and prejudice on the part of the jury in rendering it.

Same—When Scaling of Excessive Verdict not Proper on Appeal.
  6. Where it clearly appears that an excessive verdict is due to the passion and prejudice of the jury leaving no basis upon which the

---

5. Excessiveness of verdicts in actions for personal injuries other than death, see notes in 16 **Ann. Cas.** 8; **Ann. Cas.** 1913A, 1361; **L. R. A.** 1915F, 30.

appellate court can scale it, the cause will be remanded for a new trial, leaving the amount to be fixed by the calm and sober judgment of the jury if on a retrial plaintiff should prevail.

*Appeal from District Court, Valley County; H. C. Hall, Judge.*

ACTION by George J. Hanley against the Great Northern Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

*Mr. I. Parker Veazey, Jr., Mr. W. L. Clift* and *Mr. R. H. Glover,* for Appellant, submitted a brief; *Mr. Clift* argued the cause orally.

Although it may be said that a party has no vested right to have his case tried by any particular juror, it is a denial of his rights under the Constitution and statute of this state to require him to try his case before a local jury or a jury largely composed of local residents, when reasonable efforts would have secured a sufficient number of qualified jurors from box No. 1 to complete the trial jury. (*Dixon* v. *State,* 91 Tex. Cr. 217, 238 S. W. 227; *State* v. *Showen,* 60 Mont. 474, 199 Pac. 917.)

This is a case like *Gillespie* v. *Great N. Ry. Co.,* 63 Mont. 598, 208 Pac. 1059, and *Everett* v. *Hines,* 64 Mont. 244, 208 Pac. 1063, where the verdict can be accounted for only by reason of passion and prejudice, and justice can only be done by granting the defendant a new trial. If the verdict had been for anything less than the full amount sued for, there might be some basis for the assumption that possibly the verdict had been fairly found, after calm and dispassionate consideration of the evidence, but the record here is convincing that the jury merely retired and returned an unconscionable verdict because of passion and prejudice.

*Messrs. Norris, Hurd, Rhoades & Hallett,* for Respondent, submitted a brief; *Mr. Edwin L. Norris* argued the cause orally.

The court having decided that the necessary jurors could not be obtained from box No. 1 without great delay and ex-

pense, its action in having recourse to box 3 was proper under section 8911, Revised Codes of 1921. (*Lee* v. *Hayden,* 63 Mont. 589, 208 Pac. 596; *State* v. *Showen,* 60 Mont. 474, 199 Pac. 917; *State* v. *Pippi,* 59 Mont. 116, 195 Pac. 556.)

A verdict may be excessive without having been rendered under the influence of passion and prejudice. The mere fact that the verdict in the opinion of the court is excessive, or that the verdict appears on its face excessive, is not a sufficient ground for judicial interference unless it appears to have been the result of passion or prejudice. (*Kennon* v. *Gilmer,* 9 Mont. 108, 22 Pac. 448; *Sweeney* v. *City of Butte,* 15 Mont. 274, 39 Pac. 286; *Flaherty* v. *Butte Elec. R. Co.,* 42 Mont. 89, 111 Pac. 348; *Lewis* v. *N. P. Ry. Co.,* 36 Mont. 207, 92 Pac. 469; *Yellowstone Park Ry. Co.* v. *Bridger Coal Co.,* 34 Mont. 545, 115 Am. St. Rep. 546, 9 Ann. Cas. 470, 87 Pac. 963; *Neary* v. *N. P. Ry. Co.,* 41 Mont. 480, 110 Pac. 226; *Bourke* v. *Butte E. & P. Co.,* 33 Mont. 267, 83 Pac. 470: *Hollenbach* v. *Stone & Webster Eng. Co.,* 46 Mont. 559, 129 Pac. 1058; *Kelly* v. *John R. Daily Co.,* 56 Mont. 63, 181 Pac. 326.)

No error is specified as to the judgment or verdict upon the ground that the verdict is the result of. passion or prejudice on the part of the jury. The mere fact that the verdict appears to be excessive is not ground for a new trial.

The only complaint made in the specifications is that the evidence is insufficient to justify a verdict in the amount rendered. Under such specifications a new trial may not be granted. (*Lewis* v. *Northern Pac. Ry. Co.,* 36 Mont. 207, 92 Pac. 469; *Kelly* v. *John R. Daily Co.,* 56 Mont. 63, 181 Pac. 326.)

It is clear that the respondent is entitled to a verdict in some amount as a matter of law. In such case a new trial should not be granted even though the damages appear excessive. (*Helena & L. S. & R. Co.* v. *Lynch,* 25 Mont. 497, 65 Pac. 919; *Everett* v. *Hines,* 64 Mont. 244, 208 Pac. 1063.)

MR. CHIEF COMMISSIONER LAW prepared the opinion for the court.

The plaintiff, Dr. Hanley, claims to have been injured on December 22, 1917, near Oswego, Montana, by reason of a head-on collision between the train upon which he was being carried as a passenger and another of defendant's trains. He contends that while riding in the day coach he was thrown forward from his seat by a sudden stopping of the train, thereby severely wrenching his body, straining his muscles, and rupturing his abdominal walls, by reason of which he became sick and sore, and at all times since has suffered and now suffers physical and mental pain. He asserts that his injuries are of a permanent character, and that they have in the past and will in the future seriously interfere with the practice of his profession (that of the general practice of medicine), and claims damages as a result of his injuries in the sum of $15,000. The defendant admits negligence and liability for any damages to the plaintiff proximately caused by the collision, but denies that the plaintiff sustained any damages proximately or otherwise by reason of the accident.

The action was commenced on December 18, 1919, came on for trial December 20, 1920, and a verdict for plaintiff in the sum of $15,000 was returned on December 31, 1920, and judgment entered thereon January 3, 1921. The appeal is from the judgment. Twenty-nine errors are assigned, all of which, so far as it is necessary for us to consider them, may be grouped into three divisions, namely: Objections to the jury panel; rejection of testimony offered by the defendant; and an excessive award of damages by reason of the passion and prejudice of the jury.

The cause was first set for trial on December 6, 1920. On December 2d the presiding judge learned that only three cases on the trial calendar would be ready for trial, and excused from attendance for the trial term the entire panel of jurors drawn from jury box No. 1. He then ordered that the names of fifty jurors be drawn from box No. 3 to report December 7th, and reset the trial of this cause for that date. Twenty-

eight of the fifty so drawn reported, together with one of the original panel who had not received his notice to not appear. The defendant's challenge to this panel was sustained after the plaintiff had withdrawn his opposition to the challenge. The judge then made an order that fifty names of jurors be drawn from box No. 1 to report on the morning of December 14th at 9:30. Of this venire only seven of the fifty reported. The court then made an order reciting the statutory prerequisites to a drawing from box No. 3, that fifty jurors be drawn from box No. 3 to report at 1:30 P. M. of that day. The record is silent as to how many responded to this call. The court again, after the withdrawal by plaintiff of his opposition, sustained defendant's challenge to this panel. The cause was then reset for trial on December 28th, and on December 15th the court made the proper order for a panel of jurors, consisting of seventy-five names, to be drawn from box No. 1, to report December 28th at 9:30 A. M. Seventy-five were drawn in response to this order, thirty-nine served with process, eighteen reported for duty, and sixteen qualified. Only two absentees of this venire filed affidavits claiming exemption from jury duty. No record of the reasons for nonattendance, other than that the absentees were excused, was made, no reasons assigned or given. The panel was challenged by the defendant on the ground that certain jurors had not been duly served with process, and others improperly excused. This was submitted on the records and files of the court, and denied. The court proceeded to select the trial jury, and, when each party had exercised two peremptory challenges, thereby exhausting the panel, he made the usual statutory order for drawing forty jurors from box No. 3 to report at 5 P. M. of that day. It does not appear just how many of this panel reported. The defendant, however, challenged the panel for the reason that there was no lawful justification for drawing jurors from box No. 3. The challenge was denied without evidence or argument in support thereof, the trial jury completed, and the cause proceeded to trial.

Respondent suggests that the decision of this court in *Lee*
[1]    v. *Hayden*, 63 Mont. 589, 208 Pac. 596, is determinative
of the questions here presented concerning the trial jury.
With this contention we do not agree. The only question
before the court in that case was whether the jurors drawn
from box No. 3 by proper order under the provisions of section
8911, Revised Codes of 1921, could by order of the court under
certain conditions become a part of the regular trial panel.
This question was decided in the affirmative. The many ir-
regularities presented in this case were not present in the case
of *Lee* v. *Hayden.* The record presented here is not such as
to enable us to determine whether there was error in the pro-
ceedings to obtain the trial jury. Except in a few instances,
the failure of the jurors to attend is unexplained. Just how
many and for what reasons the jurors were excused by the
judge does not appear. The action of the judge in arbitrarily
discharging the regular venire drawn from box No. 1, and
thereupon drawing a jury from box No. 3 for the trial of the
cause, was of course unauthorized in law, and a denial to the
defendant of his right to try his case to a jury drawn from
the county at large, and the judge properly sustained a chal-
lenge to this panel. It then appears that out of the fifty
jurors drawn from box No. 1 to report one week hence only
seven of the fifty reported, a most unusual condition. And
again the court ordered that fifty names be drawn from box
No. 3 to complete the trial jury. Defendant's challenge, how-
ever, was sustained to this panel and finally we have a situa-
tion whereby sixteen jurors qualified for service out of a venire
of seventy-four names drawn thirteen days prior to the date
of the trial. As a result of this situation, the court again
resorted to box No. 3 to complete the trial jury.

The reasons for the necessity of requiring, so far as reason-
ably possible, a jury drawn from the county at large, are
[2]    obvious, and it is unnecessary for us to enumerate or
discuss them here. The court is not authorized to arbitrarily
draw a jury from box No. 3 for the trial of cases of this
character. He can do so only when, in his opinion, it is

necessary because of the existence of certain conditions.
Neither is the court authorized to arbitrarily excuse jurors
and bring about the conditions which invoke the exercise of
his discretion as to the use of box No. 3 for trial jury pur-
poses. This was the first case of the term to be tried, and we
find the court without a sufficient number of jurors from which
to select a jury, should both parties elect to use the challenges
to which they were entitled. The conditions surrounding the
selection of the jury for the trial of this case cannot be re-
garded with favor. The record, however, is silent on so many
matters of importance that we are unable to say whether the
presiding judge did or did not abuse his discretion in excusing
jurors or in drawing from box No. 3, and, in the absence of
a proper record from which we might determine the question,
we cannot presume irregularity of official conduct. The pre-
sumption is that official conduct has been regularly performed.
However, we feel disposed to suggest that greater care should
be exercised by the courts than is indicated by the record in
this case, to the end that the rights of a party litigant may
not be prejudiced by being compelled to try his case before
a jury selected largely from one community. We certainly
cannot commend the actions of the court in this case to judges
as a precedent for future proceedings.

George O. Reinhart, a witness who had driven Dr. Hanley's
[3]   car on several trips to the country after the alleged injury,
was asked: "Did the doctor at any time instruct you that he
was suffering from hernia or any other injury which made it
necessary for you not to drive fast?" His answer was: "No,
sir." Counsel for plaintiff moved the court to strike out the
answer, without assigning any reason for the motion. The mo-
tion was sustained. The question was then objected to for the
reason that it was duplicitous, and called for a conclusion of
the witness on matters upon which he had not shown himself
competent to testify. The objection was sustained.

Witness Reeble, proprietor of the hotel where Dr. Hanley
lived after the accident and with whom he was in daily con-
tact, was asked: "Did Dr. Hanley appear to handle his pro-

fessional business in the same manner, so far as you could observe, after his return in January, as he did prior to his departure in December?'' The witness answered, ''Yes, sir,'' without objection. Plaintiff moved to strike the answer without assigning any reason. The motion was sustained. Objection was then made that the question calls for a conclusion, and does not call for a matter of fact within the witness' personal knowledge, which objection was sustained. In six instances, with as many witnesses, questions of similar import were asked, answered, and upon motion, without assigning any reason therefor, the answers were stricken. It is not necessary for us to decide whether the questions were objectionable for any reason. It is settled law that one must object to improper testimony when it is offered, or abide by the result, and a party cannot sit by without objection and speculate as to whether the evidence may not be favorable to him, and, when it appears to be objectionable, move to strike it out. (*Pure Oil Co.* v. *Chicago, M. & St. Paul Ry. Co.*, 56 Mont. 266, 185 Pac. 150.) It is argued, however, that the explanation for the various motions to strike out the answers is that counsel for respondent had no opportunity to object to the questions before the answers were given, and that in such cases the motion should be granted as a matter of right. If the record in this case disclosed that the answers were given before counsel had an opportunity to object, the principle contended for would be applied. However, such is not the case. In no instance did counsel predicate his motion upon the ground that he had had no opportunity to object to the question, nor did he assign any other reason for the motion in any instance. Neither did the court suggest any reason for his action in sustaining the motion. Considering the nature of the questions in each instance, we believe we are justified in assuming that, had the answers been favorable to his client's cause, no motion would have been made to strike them out. We cannot assume an unduly hasty answer merely because counsel objected to the question in each instance after his motion had been sustained. The interposition of an objection was the only and proper.

method of preventing an answer to the question after counsel had succeeded in having the unfavorable response to the question stricken. If hasty action on the part of the witness in answering the questions had prevented counsel from interposing proper objections, he should have advised the court of his reasons for desiring the unfavorable answers eliminated from the record. The court then could have exercised its judgment as to whether the motion should or should not be sustained. It was not for the court to try counsel's cause or to assume that some proper reasons unassigned by counsel, existed for elimination of the answers. The rule contended for by the plaintiff in this case would entirely destroy the well-established principle that a party may not speculate or gamble upon the answers to objectionable questions, for if he may, without assigning a reason for an answer, eliminate on motion and then interpose an objection to the question, he may in all cases await to ascertain whether the answer is to be favorable or unfavorable, and then make the record to meet his pleasure. The contention in our judgment emphasizes the necessity for the rule. There was nothing before the court upon which it could exercise its discretion or use its judgment as to counsel's right to have the answer stricken. It seems also that counsel's contention in this respect has been disposed of in the case of *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494, where it was said: "Counsel cannot sit by until a question has been answered, and then, if he deems the answer inimical to his client's interest, object to it. Of course, if it appeared that the answer had been made before counsel had an opportunity to object, he could not be held to have waived his right to object, but there is not any showing made here that such was the case, and under the rule this objection came too late." We think the court erred in each instance by ordering the answer stricken. We do not consider it necessary to decide other assignments of error as to admission or rejection of testimony. They seem to involve no questions of serious proportions, and if error was committed, proper rulings may be easily made at the retrial of this case.

Were the damages awarded so excessive as to indicate passion
[4] and prejudice? At the time of the argument in this
court appellant asked permission to amend specification of
error No. 1, which then was as follows: "It was error in the
court to deny and overrule defendant's motion for a new
trial"—to read: "It was error in the court to deny and over-
rule defendant's motion for a new trial on the ground that the
verdict was the result of passion and prejudice on the part
of the jury." Counsel for respondent objected to the proposed
amendment. We do not wish to encourage the allowance of
amendments to assignments of error coming as late as this
one; and, if, upon examination of the record before us, we
were of the opinion that any prejudice might result, we would
unhesitatingly deny the request. However, we find, upon ex-
amination of the transcript, that the appellant assigned as one
of his reasons in support of his motion for a new trial in this
cause in the court below "excessive damages appearing to have
been given under the influence of passion and prejudice." An
examination of respondent's brief discloses the question of ex-
cessive damages carefully and completely argued. We are
therefore of the opinion that the amendment to the specifica-
tion should be allowed.

At the time of the accident the plaintiff was about fifty-
[5] seven years old. He had graduated from a medical college
in 1887, and had been admitted to practice as a general practi-
tioner of medicine, and has since taken several postgraduate
and supplemental courses of studies. He practiced successively
at St. Paul, Roseau, Cass Lake, Perham, Moorhead, Minneapolis,
Thief River Falls, Grasston, Braham, Deer River, Virginia,
Minneapolis, St. Paul, and South St. Paul, Minnesota, at Scobey,
Plentywood, Lambert, Malta, Grass Range, Montana, Detroit,
Michigan, and at Roy, Montana. On December 21, 1917, he
secured passage on the Great Northern train at Malta, bound for
Superior, Michigan, and took his seat in the day coach toward
the rear end, and went to sleep. The back of the seat in front
of him was thrown forward, and his baggage placed on the seat

and covered by his overcoats. He was not then conscious of anything until he found that he had been thrown forward over the seat in front of him. When he recovered a standing position he found he "was painful." After the accident the representative of the defendant company came through and asked him if he had been injured, and he made a memo in which he claims to have said that he was "wrenched and strained." He also had pains about his abdomen. He then, without examining himself to determine if he had been injured, resumed his seat and remained there until the following morning, when he went to the dining car, where he ate his breakfast. After breakfast he returned to the day coach, and remained there until he arrived at Minot, North Dakota, where he carried his baggage off the train and remained about twenty minutes, when he boarded another train bound for Grand Forks, North Dakota, where he arrived in the early morning of December 23d. Here he secured hotel accommodations, and examined himself, and found a bulging just above the navel, and pain on each side of his ribs; also separation of the cartilages uniting two of the ribs to the sternum. He bound himself, and made a compress of cotton and placed it over the opening in the natural surface of the abdomen. The size of this opening was about that of a quarter dollar. He was quite fat, and had trouble discovering his broken ribs. He went to bed at Grand Forks suffering somewhat, but his rest gave him some relief. On the evening of December 23d, he continued on his trip to Superior, where he arrived on December 24th, and remained until December 31st, where he practiced his profession two, three, or four days. From Superior he went to St. Paul. Drs. Jones and Bacon, whom he had known for many years, examined him.

Dr. Jones, who gave his deposition, testified that he found a broadening in the space between the recti abdominus muscles above the navel of about one-fourth to one-half of an inch more than the normal separation; also found crepitus at juncture of left ninth rib with its cartilage. The doctor again examined the plaintiff on September 10, 1919, and discovered

some increase in the separation between the recti muscles, and again on February 20, 1920, when he found the separation somewhat exaggerated. And the day before he gave his deposition, on December 23, 1920, he examined the plaintiff, and found the conditions about the same as when he examined him in February. He found no scar in the vicinity of the navel at any time.

Dr. Bacon, who gave his deposition, had examined the plaintiff on December 31, 1917, and found the left eighth rib loose at cartilage attachment in front, and also small navel hernia. He had no record of having found a separation of the recti abdominus muscles, but remembered there was some separation. On September 25, 1919, he made an additional examination, and found a navel hernia, and also a separation of the recti abdominus muscles, and again on February 17, 1920, upon examination he found the eighth lower rib loose. He thought the navel hernia might have been congenital. The plaintiff, after visiting Drs. Jones and Bacon, on January 3, 1919, visited Dr. Quinn, chief surgeon of the Great Northern, to whom he submitted himself for examination. Dr. Quinn could not find crepitus of his ribs, but felt around the hernia with his fingers. From St. Paul the plaintiff came to Roy, Montana, where he arrived before January 10, 1918. About February 22d following he moved to Moore, and continued in the practice of his profession. From Moore he went to Hobson, and from Hobson to Judith Gap, and at this place he practiced until October 15, 1918. He never told any one of his friends or associates that he had been in a wreck or had been injured. While at Hobson he took long drives over rough roads. From Hobson he went to Great Falls in October, 1918, where he practiced until August 22, 1919, except for the month of July, 1919, when he practiced at Hardin, Montana. From Great Falls he went to Detroit, Michigan, and practiced until January 20, 1920. He then visited a clinic at Rochester, Minnesota, as an observer, for ten days. From there he went successively to Center, Mandan, and Gamble, North Dakota, where he was engaged in the

practice of his profession until May 7, 1920, when he went
to Ellendale, and practiced for a month, and from there he
went to Church's Ferry, and at the close of his trial he was
going to Detroit, Michigan, to engage in the practice of his
profession.  He had seen operatioins for hernia at Rochester
(Mayo's), Chicago, New York, Baltimore, and Berlin, Ger-
many, but had never performed one.  He concluded not to
submit to a surgical operation at Rochester, because he thought
the result would only be beneficial temporarily, and the trouble
might recur, but did not know why he could not be operated
on successfully.  At Hobson, Montana, after his injury, he took
every case that came to him, as far as he could get to them.
In August, 1920, he said that wherever he went he expected to
establish himself in active practice.  He had a great deal of
good medical training, and could make a place for himself
anywhere.  There was no fear for him wherever he went.  The
exhibit shown him stating that he had received a ''jar or
wrench'' might be his writing and the signature might be his;
he did not know.  On cross-examination he stated that he did
not agree with Keen's Surgery, by Dr. Coley, that hernia is
a disease rather than an accident.  He was prejudiced against
surgeons who are making their living as employees of rail-
roads, because they would refuse to inspect injuries, and
have ulterior motives.  He thought his own judgment su-
perior to Dr. John J. Moorehead's, captain of the Medical
Reserve Corps of the United States army, because he (plain-
tiff) was under oath, and Moorehead was not, when he wrote
his book, and was also writing a book of excuses for companies
which employed Moorehead to escape liability.  He did not
agree with the authors who asserted that navel hernias were
of gradual development—frequently of congenital origin.  He
thought there were fancies in medicine which change from
year to year.  He disagreed with Bull and Coley, who had in-
vestigated the history of 10,000 cases at the ruptured and crip-
pled hospital, and only two were found to have been due to
violence, and one of these was caused by being gored by a

bull and the other by equally direct penetrating violence. He did not agree with Outen, Sultan, and other authors who had investigated the subject of hernia and its causes, but had never seen a traumatic hernia due to nonpenetrating accident. He also disagreed with Dr. Moorehead, the author of a treatise on traumatic surgery, who asserts that injury is never the sole producing cause of navel hernia. There was nothing in his. condition prior to the accident which led him to believe that he had a tendency towards hernia.

Dr. John B. Sullivan, also a lawyer, in July, 1920, examined the plaintiff, and found a double separation or rupture of the recti abdominus muscles, one above and one below the navel. He thought the condition permanent, would grow worse, and that it was impossible for Dr. Hanley to do the work he could have done prior to the injury. He thought the doctor had been practically eliminated from his profession. He examined the plaintiff in the presence of the jury, and found no navel hernia, but found separation of the recti muscles. He knew Dr. Hanley's case was a rare one, because he had seen thousands and thousands of patients, but had never seen an injury like his. He probably had seen 500 cases of rupture. He had found among his patients some men with separation of the recti muscles, and they all had a history. He disagreed with the theories and conclusions of Bull, Coley, and Moorehead, authors of treatises on hernia and traumatic injuries, and was sure that trauma was the cause of all hernia. He found no broken ribs nor crepitus, but found callous, which indicated that the ribs had been injured at some time.

Dr. L. L. Mayland examined plaintiff in the summer of 1920, and also the day before the trial, and found separation of the recti muscles above and below the navel, and some protrusion above, but none below, the navel. He thought the condition permanent, and would not advise an operation. As to advising of his experience with rupture, he could only say that he had had between one and a thousand cases.

The defendant produced a number of witnesses who were on the train and in the day coach with Dr. Hanley at the time of the accident. Among them was Mrs. Hilmer Hagen, who testified that she was riding with her husband and three children near the middle of the car. The sudden stop did not disturb the children sleeping in a seat in front of her. She went on to St. Paul in the same car, saw no one in the coach who had been hurt, except a little girl who had rolled off a seat and injured her thumb. The impact threw her slightly forward, and awakened a baby sleeping in her arms. She saw Dr. Hanley the next morning sitting a seat or two back of her. Her husband, Hilmer Hagen, thought the brakes were put on quickly. He was leaning over, and the impact just threw him over against the seat by his children. He saw no evidence of anyone having been injured when he walked through the car after the accident.

Mrs. Schilling had boarded the train at Seattle, did not call it a collision, and thought they stopped quite suddenly at a station. She was riding with her back to the engine, and could not say the stop jarred her in the least. Her husband was reclining on one of the seats, and was not thrown from his seat. He walked through the car, and saw no evidence of anyone having been injured.

Mrs. Wade, riding with her face to the engine, was not thrown off her seat, and a little girl seated with her was not thrown from her seat. The sudden stop had no effect on N. E. Wilson. The stop did not awaken Mr. Jerome, who was seated beside him. He saw a little girl crying who had rolled off the seat where she had been sleeping.

D. K. Kimball, claims attorney for the defendant, was on the train, went through the day coach after the accident, and did not observe an injury to any passenger. Dr. Hanley visited him in St. Paul early in the following January, after he had returned from Superior, and told him that his back and side were hurt, but did not mention having sustained a hernia, separation of the recti muscles, or broken ribs. Dr. Hanley

told him that he had not been examined at the time of his visit by anyone.

Edwin O. Sando, druggist at Roy, Montana, testified that Dr. Hanley returned to his practice about January 7, 1918, and between that date and February 15th he filled fifty-eight of the doctor's prescriptions, and saw the doctor frequently. There was no difference in his appearance after his return, and the doctor never complained of having received any injury. The doctor loafed in his store, as people do in small towns.

J. J. Reeble, hotel-keeper at Roy, met the plaintiff in the fall of 1917, and was with the doctor a great deal after his return from his trip. He never complained of his injury, and there was nothing about his conduct to indicate a different state of health after his return.

George A. Dunn, druggist at Hobson, saw the doctor frequently from March until October, 1917, in his store, on the street, and filled the doctor's prescriptions. The doctor loafed in his store during his leisure time. The doctor made country trips, wrote 150 to 200 prescriptions, and never told of his injuries.

George E. Jay, hotel-keeper at Hobson, with whom the doctor roomed during the time he was in Hobson, had frequent conversations with him, and the doctor never mentioned the accident or injuries.

George O. Remhart had driven the doctor on long trips and over rough roads while he was at Hobson, and he never complained about pain or disability. He did tell the witness of having been in an automobile wreck.

Preston P. Clement, conductor, went through the train, took a signed statement from the doctor, in which he said that he had been "jarred or wrenched," and saw no other persons who complained, except a child with an injured thumb. He said the train stopped forty minutes on account of the accident.

Dr. Mark D. Hoyt testified that a blow on the abdomen sufficient to bring about such a condition as Dr. Hanley described would have rendered him unconscious, and caused sickness at

the stomach. Hernia as a rule was caused by a disease or congenital weakness. He examined the doctor in the presence of the jury, and found a separation of the recti muscles about four inches long and two inches wide; when the doctor was standing the separation was hardly appreciable; when lying and straining it was quite prominent. He thought the separation had slowly and gradually developed from weakness of the abdominal wall, and perhaps brought about by excessive fat and insufficient exercise. He thought it could not have been produced by being thrown forward as described by the doctor, for the reason that the abdominal wall is stronger than the intestines, and that force sufficient to have driven a soft intestine through the abdominal wall would have ruptured the intestine before the abdominal wall.

Dr. T. L. Cockrell thought the doctor might have fractured his ribs in the manner described by him, but he could not have produced the hernia in that manner. He could find no protrusion when the doctor was standing, but when he reclined, there was a slight bulging. He thought the condition probably due to atrophy of the muscles.

Dr. Herbert Brown met the plaintiff in June, 1918, boarded at the same hotel, and became quite intimate. The plaintiff complained about having used a serum which resulted in disaster to him. He also talked to the witness about taking up contract plastering, and thought he could put on as much plaster as when he was a young man; also advised him of a probable personal encounter with a doctor at Lewistown, and, though the doctor at Lewistown was a large man, he thought he could give him the worst of the deal. He frequently boasted of his physical condition, and said it was as good as it ever was.

Dr. Arthur Needles, of Scobey, had known Dr. Hanley for nine years, and the doctor told him in 1915 he could not well crank a car for the reason that he had a ventral hernia. In June or July, 1920, Dr. Hanley had visited him, told him he was in trouble and wanted him to testify that he had examined

him prior to 1917, and that at that time the plaintiff did not have a hernia. The doctor suggested that it would be very easy for him to say that, and that he was very anxious to fix the time prior to the accident at which he did not have a hernia. Witness told him he had never examined him, and could not so testify.

Dr. Hanley testified in rebuttal, admitting that he visited Dr. Needles, and insisted that the doctor had examined him prior to the war, and contended that Dr. Needles assigned as his reason for refusing to testify that he was surgeon for the Great Northern Railway. He denied stating in 1915 that he had ventral hernia, but did not deny that he had said that he had been in an auto wreck, or had made boasts of his physical condition after the date of the accident, or that he contemplated returning to contract plastering.

Plaintiff stresses his loss of earnings, contending that prior to the injury he was making $3,500 annually net, and that from December, 1917, to December, 1918, his earnings were at the rate of $1,000 anually net, and at the time of his trial they were almost nothing. He thought his annual loss in business due to the accident was about $2,500. This contention can hardly be reconciled with other statements made by him. He told no one of his injuries in the communities where he practiced; he did all the work he could get at Hobson; in August, 1920, his deposition was taken, and he said: "Wherever I go I expect to establish an active practice. I have a great deal of good medical training and I can make a place for myself any place. There is no fear for me wherever I go." At the close of his trial, he expected to go to Detroit, Michigan, to establish his practice. We cannot conclude without calling attention also to the alleged cause of his injuries. He claims to have been thrown from his seat forward, partly over the top of the seat in front of him, the back of which had been thrown forward. In normal health he weighed about 200 pounds; he was the only one on the entire train who received an injury other than a scratch on the thumb

[99 Mont. 267.]

by a little girl; children sleeping on the seats in the same car were not jolted from the seat or awakened by the impact; other men and women sitting, reclining and sleeping were not disturbed except by a slight jar or jolt seemingly caused by the sudden stopping at a station or the application of the brakes; the train was not derailed, and all passengers proceeded without change of cars; the pilots alone of the engine were damaged.

We are of the opinion, after a careful review of the evidence, and giving to it weight most favorable to the plaintiff, that the verdict is unconscionably excessive, and that the amount could not have been arrived at except for the passion and prejudice of the jury.

Respondent's counsel insist, however, that it is clear that [6] the plaintiff is entitled to a verdict in some amount as a matter of law. With this contention we do not agree. However, this case falls clearly within that class of cases where we have no basis upon which to declare the proper amount to be allowed the plaintiff as damages. To do so is to substitute ourselves in this respect for the jury. (*Gillespie* v. *Great Northern Ry. Co.*, 63 Mont. 598, 208 Pac. 1059.) We are at liberty only to declare the amount excessive, and leave the amount to be fixed by the calm and sober judgment of the jury, should plaintiff prevail on a retrial of this cause.

We therefore recommend that the judgment be reversed, and the cause remanded for a new trial.

PER CURIAM: For the reasons given in the foregoing opinion, the judgment appealed from is reversed, and the cause remanded to the district court for a new trial.

*Reversed and remanded.*

Rehearing denied March 15, 1923.