## 12844

### WADDELL v. CARY *ET AL.*

(152 S. E., 179)

October, 1927.

*Messrs. R. G. Stone, H. C. McKnight* and *T. H. Munro,* for appellants,

*Mr. E. M. Blythe,* for respondent,

February 26, 1930.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action by the plaintiff, John M. Waddell, against the defendants, Fannie S. Cary, M. S. Ball, E. C. Dye, and F. Jordan, is an action of foreclosure and was commenced in the Court of Common Pleas for Greenville County, February 26, 1927. Service was made upon all of the defendants, except the defendant M. S. Ball, and it appears that he had no interest in the subject-matter of the action, and no personal judgment was asked against him. The defendants, Fannie S. Cary, L. H. Cary, and F. Jordan, filed an answer to the complaint, but the defendant E. C. Dye did not answer. Upon issues being joined, the cause was referred to the master for Greenville County to take the testimony and report his findings of fact and law. From the report of the master, holding that the defendants Fannie S. Cary and L. H. Cary were liable for a deficiency judgment, in the event the mortgaged premises did not bring enough to pay the obligation in question, these defendants, Fannie S. Cary and L. H. Cary, appealed to the Circuit Court. The cause was heard by his Honor, Judge M. L. Bonham, who, after hearing argument by counsel and after giving the matter careful consideration, confirmed the master's report, and gave judgment against the defendant Fannie S. Cary and L. H. Cary for the amount of the obligation involved, less the sum derived from the sale of the mortgaged premises.

From the decree of his Honor, Judge Bonham, and the entry of judgment thereon, these defendants, Fannie S. Cary and L. H. Cary, have appealed to this Court, upon exceptions to which we shall hereinafter advert.

The note and mortgage in question were executed by the defendant M. S. Ball to the defendant Fannie S. Cary, May 11, 1920, which obligation became due May 11, 1921. On the 16th day of October, 1920, the defendant Fannie S. Cary duly assigned the note and mortgage to the defendant E. C. Dye, and at the time of the assignment the defendant L. H. Cary indorsed the said note, guaranteeing payment thereof to the said E. C. Dye and his assigns. October 19, 1920, the defendant M. S. Ball conveyed the lot of land covered by the mortgage to the defendant E. C. Dye. Later, May 11, 1921, the date the obligation became due, the note and mortgage were assigned by the defendant E. C. Dye, to John M. Waddell, the plaintiff herein, who at the time of the said assignment to him paid to the defendant E. C. Dye the full amount due on the said note and mortgage. At the time of said assignment unto the plaintiff by the defendant E. C. Dye, he (the said E. C. Dye) wrote the following letter to the plaintiff: "This is to agree to pay you eight per cent. interest, payable semi-annually on note of M. S. Ball for $1,500.00, which I have assumed, the same being dated May 11, 1920, and interest being paid thereon May 11, 1921."

It is the contention of the appellants, Fannie S. Cary and L. H. Cary, that the writing of this letter by Dye, agreeing to pay a higher rate of interest, discharged them from all obligations on the contract, and in their appeal to this Court, their exceptions, which are as follows, raise no other question:

"1. The Circuit Judge erred in holding that the agreement signed by E. C. Dye changing the rate of interest on the note from 7 to 8 per cent. was not such a material alteration as to release the parties secondarily liable.

"2. That the Circuit Judge erred in not holding that when E. C. Dye signed the agreement to change the rate of interest on the note from 7 to 8 per cent. that this was a material alteration of these defendants' contract.

"3. In not holding that any material alteration of a note after execution and delivery will destroy it as to all parties not consenting to such alteration."

As stated, the sole question presented to this Court for consideration by the exceptions is, Did the letter written by Dye to Waddell agreeing to pay Waddell a higher rate of interest, discharge the defendants, Fannie S. Cary and L. H. Cary, from their contract as guarantors on the note in question? The note in question, a negotiable instrument, executed by M. S. Ball and made payable to Fannie S. Cary, or order, was sold, assigned, and transferred by Fannie S. Cary to Dye, and being indorsed by her, Fannie S. Cary, as payee, she became liable as guarantor. L. H. Cary also indorsed the note as guarantor. This fact was alleged in plaintiff's complaint and admitted in the answer of the Carys. The letter upon which the defendants, Carys, rely, as constituting an agreement that discharged them from liability on the note in question, constituted an independent contract between Dye and Waddell and in no way affected the rights or liability of the Carys who indorsed the note as guarantors. The letter was written by Dye to Waddell. It was not attached to the note, but was wholly disconnected from it, and there was no change or alteration whatever in the note itself, and the letter did not in any way affect the original contract entered into between the original parties. It was binding only on Dye who wrote the letter. In our opinion the following rule stated with reference to a surety, 21 R. C. L., 1006, is applicable to the question now under consideration:

"A surety is not discharged by an independent contract between the principal parties, although it may be contemporaneous with and relate to the same sub-

ject as the sureties' contract, without varying the terms thereof. To discharge the surety, such variation must be in the terms of the contract by which the surety is bound. * * *

"Again, it has been held that where a bond for the payment of money was without interest, a separate agreement by the principal, subsequently entered into under seal, that the amount of the bond should bear interest, does not avoid the liability of the sureties."

The agreement contained in the letter of Dye to ▮ Waddell being an independent collateral agreement between them (Dye and Waddell), the above-stated principle is clearly applicable and governs the question under consideration. The agreement of the Carys was to guarantee to *all* of the transferees payment of the amount stated in the note, with interest at 7 per cent. The Carys were bound by this contract at the outset and they are bound by this contract at this time. The independent collateral agreement between Dye and Waddell, growing out of the letter from Dye to Waddell, in no way affects the rights and liability of the Carys.

The cases of *Sloan v. Latimer,* 41 S. C., 217, 19 S. E., 491, 691; *Harrell v. Parrott,* 50 S. C., 16, 27 S. E., 521; *Greenville v. Ormand,* 51 S. C., 121, 28 S. E., 147; *Sanders v. Bagwell,* 32 S. C., 238, 10 S. E., 946, 7 L. R. A., 743; *Gardner v. Gardner,* 23 S. C., 588, and other cases to which our attention has been called, in our opinion, are not in point. In the case of *Sloan v. Latimer, supra,* there was an *alteration* on the *face of the note made* by *the payee, extending time of payment,* which is a different state of facts from the facts involved in the case at bar. In the case of *Harrell v. Parrott, supra,* the maker of the note several years after its execution signed his name to an indorsement *on the back of the note* providing for the note to draw a certain rate of interest, but the question now before this Court was not raised in that case. In the case of *Sanders v. Bagwell, supra,* there was an *addendum* on the lower *end of the note,* and it

was concerning this *addendum on the note* that a question was raised. In the case at bar there was no *addendum* to the note and nothing attached thereto. In the case of *Greenville v. Ormand, supra,* the Court did not pass upon the question involved in the case at bar. Neither are the other cases to which reference has been made applicable. In our opinion the contract of the Carys, guaranteeing the payment of the note and mortgage in the hands of any one who might come into possession of the same by purchase, was not altered in any way by the letter from Dye to Waddell, and that said contract is in full force and effect, in accordance with the holding of the Circuit Judge.

As to the contention that there was a merger and extinguishment of the debt when Dye purchased the land covered by the mortgage, we deem it sufficient to state that the appeal to this Court does not raise that question. The question of merger was raised in the answer of the Carys, which issue the master decided adverse to appellants' contention, and the Circuit Judge confirmed the master. There was no appeal from the Circuit Judge on this issue, and therefore that matter has been adjudicated and is not before this Court. As to the proposition that the debt was extinguished, such issue was not raised in the pleadings, was not raised before the master nor the Circuit Judge, and is not referred to in the exceptions presented to this Court. The motion of appellants before this Court, which was made after the case was heard, to be allowed to enlarge the exceptions so as to raise such question, was refused.

The exceptions are overruled and the judgment affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE COTHRAN (dissenting) : The appeal in this case was first heard at November session, 1928. For satisfactory reasons, the members of the Court being in disagreement, the case was, by the Court's own action, set down for reargument at the January session, 1930, after a protracted

delay. It was then argued, counsel for the respondent stressing the fact that the exceptions presented to this Court the single issue of alteration, as will be explained; that they did not present the issue argued by counsel for the appellants, of merger, or extinguishment. Counsel for the appellants evidently appreciated the force of the position, and after the argument had been concluded served notice upon counsel for respondent of a motion for an order by this Court allowing an amendment by way of enlargement of their exceptions so as to present said questions. That motion was heard, after four days' notice, and refused. As the matter is of considerable moment, I desire to express my views favoring the granting of the motion.

Counsel for the respondent asserted upon the argument of the motion that the matter of extinguishment of the Ball mortgage by reason of the conveyance by Ball to Dye was not suggested in the exceptions of the defendants to the master's report.

By reference to the transcript at page 11 it will be seen that the first exception is as follows: "That the Master erred in holding that when E. C. Dye, the owner and holder of the mortgage, purchased the premises under mortgage, thereby becoming the owner and holder of the legal title and the owner and holder of the mortgage, there was no merger; when he should have held, when a person buys the land under mortgage and is the owner and holder of the mortgage over the land purchased, that the mortgage is merged in the title unless it is shown that it was the intention that there should be no merger."

It is true that the exception characterized the transaction as a "merger" and not as an "extinguishment." There is hardly a perceptible difference between the two terms; the effect is precisely the same. It appears to me indisputable that, when Ball and Dye traded for the house and lot and Ball conveyed it to Dye who then held the mortgage upon it which Ball had given to Mrs. Cary, Dye paying Ball the

difference between the agreed purchase price and the mortgage, Ball's debt to Dye, which Mrs. Cary had guaranteed by her indorsement, was completely satisfied, and it makes little difference whether the effect is characterized as a merger and extinguishment or a satisfaction. Counsel manifestly intended to insist that Dye had no right to transfer the mortgage to Waddell after Ball had completely satisfied it.

The contention is that the appellants have postponed application to this Court for relief an unreasonable length of time. I admit that, but the delay has not prejudiced the rights of the respondent or shackled the power of this Court which has absolute control of all proceedings in a case until the remittitur has been sent down to the Circuit Court.

If the respondent has been misled to any extent, the case would be different.

There is absolutely no doubt in my mind that a judgment against Mrs. Cary would, under the circumstances, work a great injustice, and that the power of this great Court should be sufficient to prevent it. I believe that counsel for the respondent would admit that, if the point had been properly presented by Mrs. Cary's attorneys, there would not be a question about it.

In *Hanley v. R. Co.,* 66 Mont., 267, 213 P., 235, the Court held: "An amendment of assignment of error upon hearing in the appellate Court held allowable where it appears that the matter of the amendment had been carefully treated by both parties, and no prejudice would result, though the practice is not to be encouraged."

I am proceeding upon the principle that the Court is in control of the situation absolutely, and if it should appear unquestionably that the ends of justice will be promoted to allow the enlargement, the Court will so order. I do not think we are bound hand and foot to the omissions of counsel when a flagrant injustice appears to result therefrom. Mrs. Cary guaranteed the payment of Ball's debt, it has been paid; and that should be an end of the matter. Shall she

suffer because her counsel did not properly present the question when this Court is in a position to set the matter straight?

In *Merritt v. Dick,* 169 N. C., 244, 85 S. E., 2, the appellant offered *at the hearing* additional exceptions and moved for their consideration. The motion was refused upon the ground that their allowance would require the filing of an entirely new brief by respondents; impliedly conceding the power of the Court to allow them, but refusing upon a ground not appearing in the case at bar.

In *Whitten v. Whitten* (Tex. Civ. App.), 157 S. W., 277, it was held that fundamental errors will be considered, notwithstanding the asignments are not in proper form.

In *Davis v. Houston Oil Co.* (Tex. Civ. App.), 162 S. W., 913, it was held that the Court may consider assignments of error failing to comply with the rules when the record shows that palpable injustice has been committed.

In *Off v. Finkelstein,* 200 Ill., 40, 65 N. E., 439, it was held that it was within the Court's discretion to allow additional exceptions.

In *Roberts v. Parker,* 117 Iowa, 389, 90 N. W., 744, 57 L. R. A., 764, 94 Am. St. Rep., 316, amended exceptions were allowed when it appeared that the respondent had fully argued the questions raised and no prejudice would result.

In *Gilbert v. Coal Co.,* 62 Ind., 522, it was held that, upon a rehearing granted generally, an entirely new assignment of error may be made.

In 40 Ill., 54 (anonymous), it was held that an assignment of additional error may be allowed in the discretion of the Court.

I cannot imagine a case in which the discretion of the Court may rightfully be exercised in favor of a motion to enlarge the exceptions than in one where the injustice is palpable and no possible prejudice to the respondent can result.

It would seem that Section 436 of the Code which permits the amendment of any pleading, process or proceeding, *in*

*furtherance of justice,* would be ample authority for the allowance of the motion.

In *Parsons v. Copeland,* 5 Mich., 144, it was held that the Supreme Court has power to allow amendments to assignments of errors, and will exercise the power when justice requires it.

In *Bank v. Wollman* (S. D.), 225 N. W., 713, it was held that a legal question conspicuously appearing in the record may be considered, though asignments of error are insufficient.

In *Dennis v. Roberts* (C. C. A.), 19 F. (2d), 1, it is impliedly held, that plain errors appearing upon the record may be considered in the absence of an assignment of error covering them.

In 3 C. J., 1399, it is said: "In the furtherance of justice, the right to amend assignments of error is very generally recognized." Many authorities are cited in support of the text.

The power of the Court to grant such an order is distinctly recognized in the following cases: *McNamee v. Huckabee,* 20 S. C., 190; *Burns v. Gower,* 34 S. C., 160, 13 S. E., 331; *Correll v. Georgia Co.,* 35 S. C., 593, 14 S. E., 65; *Watts v. R. Co.,* 60 S. C., 67, 38 S. E., 240.

The strongest reason for the exercise of the power is that without it a great injustice will be permitted, and this I shall endeavor to demonstrate.

This is an action to foreclose a mortgage upon a certain house and lot in the city of Greenville, executed by the defendant. *M. S. Ball* to the defendant, *Fannie S. Cary,* to secure a note for $1,500.00, dated May 11, 1920, and due May 11, 1921, with interest at 7 per cent. from date, and attorney's fees, upon which the interest has been paid to May 11, 1926. The plaintiff, John M. Waddell, claims under an assignment of the note and mortgage by the defendant *E. C. Dye,* dated October 16, 1920, under most peculiar circumstances which will be explained. The facts are com-

plicated, but I think that the issues involved may be grasped by attention to the following narrative of the conceded facts:

On May 11, 1920, the defendant Mrs. Cary sold and conveyed to the defendant Ball a house and lot in the city of Greenville. On the same day Ball, either in full or in part payment of the property, gave his note to her for $1,500.00, due one year after date, with interest from date at 7 per cent., and secured the payment of it by a mortgage upon the premises.

On October 16, 1920, Mrs. Cary assigned the note and mortgage to the defendant E. C. Dye, a stranger to the negotiations between Mrs. Cary and Ball, by indorsing the note in blank and formally assigning the mortgage. The defendant L. H. Cary, her husband, indorsed his name upon the back of the note.

On October 19, 1920, three days after the assignment of the Ball note and mortgage by Mrs. Cary to Dye, Ball and Dye concluded an agreement by which Ball was to convey the house and lot to Dye, at a price not stated in the record, but manifestly in excess of the amount for which Ball was obligated under the $1,500.00 note and mortgage.

At this time, it will be observed and emphasized that the title to the house and lot was *in Ball,* and the title to the note and mortgage was *in Dye.*

Their agreement was closed in a most extraordinary manner. The perfectly simple process would have been for Ball to execute a deed to Dye for the property, and for Dye to pay Ball the difference between the purchase price and the mortgage, if there was any, and surrender the Ball note and mortgage to him for cancellation and satisfaction of record.

Instead of adopting this simple process, Ball executed a deed to Dye for the house and lot, and had inserted in the deed the following provision: "As a part of the consideration of this deed, E. C. Dye assumes the payment of a certain note and mortgage by M. S. Ball to Fannie S. Cary, for $1,500.00, dated May 11, 1920, due May 11, 1921, with in-

terest from date at seven per cent. per annum payable semi-annually."

Manifestly Dye's intention was to use the Ball note and mortgage in satisfying Ball for the purchase price of the property, and should have surrendered them to Ball when he received Ball's deed. The deed upon its face shows this and that Ball was released from his mortgage.

Notwithstanding this, it appears that Dye retained in his possession the note and mortgage and evidently considered that they were still obligations of Ball which he owned, although assumed by him, and that he had the right to assign them to another person.

Accordingly, on May 11, 1921, the day upon which the note fell due, Dye assigned the Ball note and mortgage to the plaintiff Waddell for value, received the money therefor, and appropriated it to his own use. At the same time, and evidently a part of the same transaction and an inducement thereto, Dye gave to Waddell a memorandum signed by him as follows: "This is to agree to pay you 8 per cent. interest payable semi-annually on note of M. S. Ball for $1,500.00, which I have assumed; the same being dated May 11, 1920, and interest being paid thereon to May 11, 1921."

The action was instituted February 26, 1927. The defendants Ball and Dye made no appearance. It is assumed that the defendant Jordan answered setting up his second mortgage. The defendants Fannie S. Cary and L. H. Cary answered setting up two defenses: (1) That the conveyance from Ball to Dye, when Dye was assignee of the Ball note and mortgage, constituted a merger of the mortgage debt and released the indorsers; (2) that the written agreement by Dye to increase the rate of interest from 7 to 8 per cent. was a material alteration of the contract of indorsement and discharged the indorsers.

The case was referred to E. Inman, Esq., master, who filed a report dated August 27, 1927, holding that there was no merger; that Waddell was a holder in due course and was

immune from such defense, if it were available, and that Waddell was entitled to judgment against Fannie S. Cary and L. H. Cary for such deficiency as might arise after sale. He made no finding upon the defense of alteration, and recommended sale of the premises in foreclosure.

Upon exceptions to the report, which raised both questions indicated in the defenses above referred to, his Honor, Judge Bonham, confirmed the report, and rendered judgment against Mrs. Fannie S. Cary and L. H. Cary for the amount of the mortgage debt and for foreclosure.

From this decree the defendants Mrs. Fannie S. Cary and L. H. Cary have appealed.

The real controversy in the present state of the litigation is the alleged secondary obligation of Mrs. Cary and L. H. Cary to pay the deficiency upon the mortgage debt after a sale for foreclosure. It appears that after decree of foreclosure the premises have been sold for less than the mortgage debt, and it is sought now to hold Mrs. Cary and L. H. Cary responsible, upon their indorsements for the deficiency.

I will assume, for the purposes of this case, that when Mrs. Cary assigned the Ball note and mortgage to Dye, and when she and L. H. Cary wrote their names on the back of the note, they became technical indorsers, with the legal obligations attached to that relation. Those obligations were due primarily to Dye and were of equal validity to a holder of the note in due course by assignment from him. They are practically an underwriting of the obligations of the maker of the note, Ball, not of the obligations of the indorsee, Dye. The Negotiable Instruments Law (Civ. Code 1922, §§ 3652-3847) defines the extent and measure of those obligations:

1. That the instrument is genuine and in all respects what it purports to be.

2. That the payee indorser has good title to it.

3. That all prior parties had capacity to contract.

4. That he has no knowledge of any fact which would impair the validity of the instrument or render it valueless.

5. That the instrument is *at the time* of his indorsement valid and subsisting.

6. That on due presentment, it shall be accepted or paid, or both, as the case may be, according to its tenor; and that, if it be dishonored and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder or to any subsequent indorser who may be compelled to pay it. 3 Code 1922, §§ 3716, 3717.

It is impossible to point to the breach of a single one of the obligations thus assumed by the alleged indorsers: That the note was genuine and in all respects what it purported to be, there cannot be a doubt; that Fannie S. Cary had good title to it is not questioned; that all prior parties, herself and Ball, had capacity to contract is not questioned; that she had no knowledge of any infirmity in the note is clear; that the note at the time she indorsed it to Dye was valid and subsisting is not questioned. It was never presented by Dye or Waddell to Ball for payment, and of course was never dishonored. It must be remembered that it was the obligation of *Ball to Dye* upon the note which the indorsers underwrote; the plaintiff as a holder in due course became entitled to the same protection, no more. If then it may be shown that in the transaction between Ball and Dye, by which Dye acquired the title to the property, *Ball's obligation to Dye* upon the note and mortgage, for which the indorsers stood sponsors, was extinguished at the time Dye assigned them to Waddell, the later acquired nothing by the assignment.

Dye was at that time the owner of the note and mortgage of Ball to Mrs. Cary; Ball owned the title to the house and lot, and owed the amount of the note and mortgage to Dye, as the assignee of Mrs. Cary; Dye and Ball agreed upon a purchase and sale of the house and lot, at a certain price; evidently Dye paid to Ball the difference between the purchase price and the Ball mortgage, and according to the terms of the deed from Ball to Dye, *Dye assumed the payment of the Ball mortgage.*

I think that when Dye took a deed from Ball of the house and lot, and agreed to assume the payment of the note and mortgage, *which he then owned,* the transaction amounted to a satisfaction of the debt, regardless of the question of merger. He could not assume the payment of the debt *to himself,* and there was no one else who could claim it. The effect of the transaction was to release Ball, the only debtor, and practically to cancel the obligation, as manifestly it was a part of the purchase price consideration of the deed. If Dye no longer had title to the extinguished paper, he could transfer no title to Waddell.

If John Doe should owe me $5,000.00 secured by a mortgage upon his home, and I wanted to buy the home for $7,500.00, which John Doe was willing to take, the simple form of the transaction would be for me to pay him $2,500.00 in cash and cancel my mortgage. The transaction in itself, regardless of a formal cancellation of the mortgage, would constitute an extinguishment, a payment, of the mortgage held by me against John Doe. I would not have the power, by an agreement to assume the payment *of my own mortgage,* to keep it alive in an assignable shape. The situation would be in no wise different, if the mortgage held by me had been acquired by assignment from another.

In *Weston v. Livezey,* 45 Colo., 142, 100 P., 404, quoting syllabus it was held: "Where the mortgagee acquires the fee in the mortgaged land by a conveyance from the mortgagor, the mortgage debt is extinguished, unless a contrary intent is manifest"—citing *Burnet v. Donniston,* 5 Johns. Ch. (N. Y.), 35, *Dickason v. Williams* [129 Mass., 182] 37 Am. Rep., 316, *Weiner v. Heintz,* 27 [17] Ill., 259.

In *Novak v. Kruse,* 288 Ill., 363, 123 N. E., 519, 521, the Court said: "It is evident that the property was deeded by Ayers and taken by the association in payment of the bond and trust deed for money loaned. That being true, the transfer of the title to the property operated as a satisfaction and extinguishment of the bond and trust deed."

In 41 C. J., 776, it is said: "The mortgagee's purchase of the equity of redemption results in the extinguishment of the mortgage debt, or in a cancellation of the mortgagee's claim under the mortgage, provided such extinguishment is in accord with the expressed or implied intention of the mortgagee. * * *".

There could hardly be a doubt of the mortgagee's intention when he expressly agreed to assume the payment of the mortgage which he himself held. There could be no other conclusion than that the mortgage was thereby extinguished.

In *Perry v. Ward,* 82 Vt., 1, 71 A., 721, the deed contained a stipulation that the grantee assumed and agreed to pay an existing mortgage as part of the purchase price. The Court held that he thereby became primarily liable for the payment of the mortgage debt, citing numerous authorities. If, by the stipulation in the deed from Ball to Dye, Dye assumed the payment of the mortgage which Ball had given, and which he (Dye) owned at the time, he thereby became the primary debtor to himself, and thus necessarily produced an extinguishment of the Ball mortgage.

The only possible effect of the assignment of the note and mortgage by Dye to Waddell, after they had been extinguished by the transaction between him and Ball, *was to initiate a new obligation of Dye to Waddell. As between them,* the obligation of Dye to compensate Waddell for the money paid for a dead security was complete; *but as between Waddell and the indorsers* of a satisfied and extinguished obligation, the situation is entirely different. The note and mortgage having become extinct by the transaction between Dye and Ball, the obligation of the indorsers, as a matter of course, was extinguished.

Viewing the case from another angle:

By signing her name upon the back of the note, Mrs. Cary became an indorser, with the legal obligations set forth in the Negotiable Instruments Law, § 3714 et seq., of Vol. 3, Code, 1922. Among these obligations is this: That on due

presentment, the note will be paid; and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, the indorser will pay the amount thereof to the holder.

Mrs. Cary's indorsement constitued an assurance against the dishonor of the note *by Ball,* not the dishonor of it by Dye under an agreement of his with which she was in no wise connected. By the conveyance of Ball to Dye, the consideration in part of which was the mortgage debt, Ball has complied fully with his obligation—*there has been no dishonor of the note by Ball,* against which only Mrs. Cary covenanted.

As a result of Mrs. Cary's assignment of the note and mortgage to Dye, he succeeded to her rights against Ball, and in addition he held her underwriting of Ball's engagements. If Ball has discharged those engagements, as unquestionably he has, the responsibility of Mrs. Cary as an indorser has necessarily been discharged.

After Mrs. Cary assigned the note and mortgage to Dye, Ball became paymaster to Dye. Has he discharged his obligation to Dye? If he has, the underwriting of Mrs. Cary has been discharged. As to this I have not a doubt. Ball owned the title to the house and lot; Dye held a mortgage upon it; Dye wanted to buy the house and lot; they agreed upon a price; Dye paid Ball the difference between the purchase price and the mortgage, and took a deed in which he assumed the payment of his own mortgage, that is, the mortgage of Ball to Mrs. Cary, owned by him. Dye used the note and mortgage which Ball had given to Mrs. Cary as so much cash, in his trade with Ball; he was allowed full credit therefor in his purchase of the property from Ball; he received full value for what had been underwritten by Mrs. Cary, and her engagements have been fully complied with. He manifestly had no right to get the full benefit of the note and mortgage in his trade with Ball, and keep them alive to obtain full face value from Waddell. If they were extinguished,

dead, they could not be resurrected, certainly not against the indorsers.

Waddell bases his right of recovery from Mrs. Cary and L. H. Cary upon his alleged relation as a holder in due course. I do not think that he has successfully maintained this contention for two reasons: (1) It is essential that the assignor of the instrument have the title to it and the right to transfer it; (2) Waddell had full notice of the transaction between Ball and Dye, which resulted in the extinguishment of Ball's debt to Dye.

In 1 Daniel Neg. Inst. (5th Ed.), § 769a it is said: "By 'purchaser' and 'holder' of a negotiable instrument is included any one who has acquired it in good faith for a valuable consideration, *from one capable of transferring it.* \* \* \*"

I have endeavored to show that by the transaction between Ball and Dye, by which Dye acquired title to the house upon the consideration in part that he would assume the payment of the Ball note and mortgage, he necessarily discharged Ball from all liability to him upon them; he could not possibly hold them as an obligation of Ball after he had assumed the payments of them; he assumed the payment of a debt due to himself as the consideration of the deed and could of course no longer hold the papers as representing a debt due by Ball to him; he could not transfer to Waddell something which he himself did not possess; he was therefore not "one capable of transferring" the note and mortgage. Dye had no more right to transfer the papers to Waddell than if he had surreptitiously abstracted them from the possession of Ball.

The second objection to Waddell's occupying the vantage ground of a holder in due course is that he was fully informed, at the time he took the assignment of the papers from Dye, of the circumstances attending the transaction between Ball and Dye which showed that Dye had no right to assign them to any one. If I am right in my conclusion that the act of Dye in accepting Ball's deed and assuming the

payment of the Ball note and mortgage constituted an extinguishment of the debt, there can be no question that Waddell was fully apprised of the facts which constitute such extinguishment.

That Waddell had notice of the fact that Dye, in his trade with Ball had assumed the payment of the note and mortgage *which he then owned,* is clear, not only from the record of the deed from Ball to Dye (which possibly might not be sufficient to charge him with notice), but from the memorandum which Dye gave Waddell at the time of the alleged assignment to him, agreeing to raise the interest from 7 to 8 per cent. In it he distinctly states the fact that he had assumed such payment. See quotation, *supra.*

In 1 Daniel Neg. Inst. (5th Ed.), Section 795, it is said: "It is quite certain that if the notice or knowledge of the transferror's defective title be express, it will destroy the purchaser's better position, for if he is actually informed of the infirmity  *  *  *  he errs willingly in negotiating for the paper, and has no claim whatever for peculiar protection" —citing *Dogan v. Dubois, 2* Rich. Eq., 85.

As is said by Woodbury, J., in *Perkins v. Challis,* 1 N. H., 254, cited by Mr. Daniel: "It must clearly appear that the endorsee was apprised of such circumstances as would have avoided the note in the hands of the endorser."

Can there be a doubt but that, if Dye, the indorser of Waddell, had before indorsement sued upon the papers, he would have been concluded by the above facts?

I have no doubt but that this extraordinary method was adopted to save the expenses of the execution of a new note and mortgage by Dye to Waddell. If so, it should be held to have the same effect; and if such course had been adopted, there could be no question of the discharge of the indorsers. It must be remembered, too, that all of these oblique transactions were conducted without the knowledge of Mr. and Mrs. Cary, who might, if they had had notice of

them, either protected their endorsements, or given matters an entirely different turn.

The theory upon which the master proceeded, which appears to have been confirmed by the Circuit Judge, is that the effect of the assumption of the debt by Dye *was to constitute him the principal debtor.* The master held: "The only effect of the assumption of payment by Dye would be to make him primarily responsible *to the previous parties to the mortgage contract."*

I do not see how this can be, except as between Dye and Waddell, who was not a "previous party." There were no previous parties with whom Dye could have established the relation of primary responsibility; he owned the note and mortgage by assignment from Mrs. Cary; she certainly was not such a previous party to whom he was obligated primarily or any other way; he could not have been primarily responsible to himself; and they were the only previous parties possibly existing.

If any liability at all was created, it was not by the assumption of the debt by Dye, but by his assignment of the note and mortgage which had been extinguished, to Waddell, upon the principle that "a sound price warrants a sound commodity," an obligation with which the endeavors were not at all conducted. Mrs. Cary undertook to underwrite the obligation of *Ball to Dye,* upon the assigned note and mortgage—an obligation which I have endeavored to show has been discharged—*not the obligation of Dye* to an assignee of a note and mortgage which had been extinguished, and which of course he had no authority or right to assign.

It seems to me impossible to conclude that by the transaction of purchase and sale between Dye and Ball, the note and mortgage in the hands of Dye retained such vitality as enabled him to assign them to Waddell, and to carry, with the assignment, the indorsement of Mrs. Cary to Dye.

It will be remembered that the basis of the plaintiff's contention is that by the assumption of the debt by Dye he be-

came the primary debtor. It is a distinct revelation that he may occupy the position of a *debtor* and at the same time that of *assignor*, a reversal of the customary order of things. What Mrs. Cary underwrote was the right of Dye against Ball, which he might have assigned to an indorsee; she did not underwrite the right of an assignee of Dye against him.

Another reason why the endorsers were discharged is that by the transaction between Dye and Ball, the principal debtor, Ball, was released from liability. Dye expressly agreed, as shown by the deed, himself to assume the payment of the note and mortgage, thereby releasing the man with whom he was directly dealing.

It is provided in Section 120 of the Negotiable Instruments Law (Section 3771 of Vol. 3, Code, 1922) : "A person secondarily liable on the instrument is discharged: * * * (5) By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved."

The first inquiry naturally is as to the relation which Dye sustained to the note, at the time that he assigned it to Waddell. The master and the Circuit Judge have both held that, when Ball conveyed the property to Dye upon the consideration in part that Dye should assume the payment of the note and mortgage which Ball had given to Mrs. Cary, Dye became the primary debtor to Waddell, in other words, stepped into Ball's shoes. The master held : "When Dye took title from Ball and in the deed assumed payment of the note and mortgage, he by that contract became primarily responsible to the Carys and Ball for the payment of the mortgage indebtedness. * * * The only effect of the assumption of payment by Dye, would be to make him primarily responsible to the previous parties to the mortgage contract." His report was confirmed *pro forma* by the Circuit Judge.

In the memorandum signed by Dye and delivered to Waddell, manifestly as a part of and inducement to the transfer of the note and mortgage, Dye distinctly recognized the fact

that he had assumed the payment of the note in Ball's stead: "This is to agree to pay you 8% interest payable semi-annually, on note of M. S. Ball for $1,500.00, which I have assumed. * * *

In other words from the date of the conveyance from Ball to Dye and the assumption of the note and mortgage by Dye, *Dye occupied the position of maker of the note,* "primarily responsible" upon it.

But for the sake of argument, concede that the appellants are not entitled to rely upon the defense of merger or extinguishment, and that the Court has correctly sustained the technical objection of the respondent and sealed its doors against the importunity of the appellants so far as this palpably just defense is concerned, I think that the agreement entered into between Dye and Waddell, to raise the rate of interest from 7 to 8 per cent. on the note and mortgage, was a material change in the underwritten obligation which discharged the endorsers.

Manifestly the agreement to raise the rate of interest was a material element in the assignment of the papers to Waddell; it was a part of the consideration of the assignment.

Counsel for the plaintiff observes in his printed brief: "The agreement by Dye to pay the plaintiff a greater rate of interest was without consideration, and therefore could not bind him."

I cannot think that counsel can be serious in this contention. It is safe to assume that Waddell would not have taken up the papers if Dye had not agreed to raise the rate of interest. At any rate, it was contemporaneous with and a part of the assignment—clearly a part of the consideration binding upon Dye.

The question is to be decided precisely as if the note had been originally executed by Dye as the maker of it. The applicable law plainly is that, when the maker and the payee of a note enter into a binding contract changing the terms of

the note in a material matter, the contract will be considered as an alteration which will discharge the guarantor or surety.

I think that the issue has been confused with a conceivable situation which would be altogether different from that presented here. If one held a mortgage, either as mortgagee or as assignee, securing a note which bore interest at 7 per cent. and desired to transfer it to another, realizing the cash for it, and the proposed transferee wanted 8 per cent. for his money, I see no reason why the buyer and the seller could not agree among themselves that the seller would pay 8 per cent. and additional 1 per cent. without affecting the liability of a surety or guarantor upon the note; it would amount to nothing more than an independent collateral agreement between the *holder* of a paper and a proposed transferee.

I do not think that there can be any question as to the correctness of the proposition that an independent, collateral agreement between the debtor and the creditor, *which does not change the terms of the contract* which the surety or indorser or guarantor has underwritten, will not discharge the party secondarily liable; but it is a very different proposition from that presented here, where the agreement, *for a valuable consideration,* between Dye, not the *holder* but *the maker* of the note, and Waddell, the *payee* by assignment, purports to alter in a material particular to terms of the underwritten obligation.

There can be no question but that, after assumption of the debt to Dye, he became the debtor and Waddell the creditor.

In the opinion of Mr. Justice Carter, the following quotation is made from 21 R. C. L., 1006: "A surety is not discharged by an *independent* contract between the principal parties, altho' it may be contemporaneous with and relate to the same subject as the sureties' contract, *without varying the terms thereof.* To discharge the surety such *variation must be in the terms of the contract* by which the surety is bound." With this pronouncement I have not the slightest

quarrel; but it does not decide the issue presented here, for the question is still open whether the agreement, which was entered into, can be considered an independent agreement, and, if so, whether it varied the terms of the contract. The fact that it may have been an independent agreement does not relieve it of the charge of an alteration, *if it varied the terms of the underwritten contract,* as the author very clearly declares.

Comparing the quotation with what is said at pages 1004 and 1008, there can be no doubt of the author's meaning:

At page 1004: "It is fundamental that *any agreement* (not any physical alteration, I interpolate), or dealings between the creditor and the principal in *an obligation or debt,* which essentially varies the terms of the contract, without the consent of the surety, will release the surety from liability."

And at page 1008: "The law carefully guards the rights of a surety on an instrument whether the relation to the principal is shown by his being a surety in the technical sense of the term, *endorser* or otherwise."

"*Any agreement* between the creditor and principal, which varies essentially the terms of the contract by which the surety is bound, without the consent of the surety, will release him from responsibility." Brandt, Suretyship, § 378.

It is sought to evade this result by contending that this was an independent agreement between Dye and Waddell. That is very true; but there never has yet been an agreement between the payer and the payee of a note which amounted to an alteration of the contract, *that was not* an independent agreement between them. That is exactly what discharges the secondary obligor; an agreement which changes the terms of the contract, to which agreement he was not a party.

It is not necessary that there should have been a physical alteration of the written evidence of the obligation, or a mutilation of it, or a memorandum of the agreement im-

posed upon it; what the law inhibits is *an agreement* that materially changes the terms of the obligation underwritten.

Can there be a doubt but that, as against Dye, Waddell could have enforced his agreement to pay 8 per cent. interest? It had every element of a valid contract, *as between them*, which is conclusive that an agreement to change the terms of the obligation had been entered into by them.

The complaint carefully avoids a demand for 8 per cent. interest; but if the rights of indorsers had not been involved, is there a doubt but that the claim would have been made against Dye, based upon the note and mortgage in question and the agreement to pay 8 per cent.?

In *Sloan v. Latimer,* 41 S. C., 217, 19 S. E., 491, 492, the Court said: "It is true no words in the note were actually stricken out, and others substituted for them. The note by its terms was due 'one year after date, July 1890,' and the memorandum written on the face of the note was in these words: 'I hereby extend date of payment of above note to January 1, 1892, with privilege of payment before maturity,' etc. *Was that not, in effect, equivalent to striking out the words 'one year after date,' and inserting in their place 'one year and six months after date'?"* (Italics added.)

In the case of *Harrell v. Parrott,* 50 S. C., 16, 27 S. E., 521, 523, the controversy was in reference to a memorandum upon a note, signed *by the maker* of the note, to the effect that the rate of interest from the date of the memorandum, four years after the date of the note, should be increased. The Court held, following *Sloan v. Latimer,* that "the effect of such an indorsement or memorandum was equivalent to an erasure and an interlineation of the note as originally written. * * *" No question arose in that case as to sureties or indorsers. But the ruling makes it clear that the effect of the agreement to change the rate of interest upon the note in question now was equivalent to an interlineation and erasure.

"Not only will an alteration vitiate the instrument as between the immediate parties, but it will vitiate it even as against a *bona fide* holder without notice as the latter can acquire no right or title other than that of the person under whom he claims," 2 C. J., 1176.

"It is a well-settled rule, if a creditor or obligee of a bond enters into any new *bona fide* contract with the principal debtor, whereby the terms of the original contract are varied or altered without the privity or consent of the surety, the surety will be discharged from his liability." *Smith v. Tunno,* 1 McCord, Eq., 443, 16 Am. Dec., 617.

In *Greenville v. Ormand,* 51 S. C., 121, 28 S. E., 147, 148, the Court said, quoting from *Mayhew v. Boyd,* 5 Md., 102, 59 Am. Dec., 101: "Any dealings with the principal contract by which a surety is to be bound, and which, by debtor by the creditor which amount to a departure from the possibility, might materially vary or enlarge the latter's liability without his assent, operates as a discharge of the surety."

"A surety is discharged by a material alteration or change without his consent, in the contract entered into by him or in the contract the performance of which is secured." 32 Cyc., 177.

In *Sanders v. Bagwell,* 32 S. C., 238, 10 S. E., 946, 7 L. R. A., 743, a note bore interest at 7 per cent, but there was an addendum on the lower end of the note in these words: "The above note is to be accounted for with interest at 8% per annum." The Court said: "Any material alteration of a note after execution and delivery will destroy it as to all the parties not consenting to such alteration. * * * This is upon the ground that every contracting party has the right to stand upon the contract which he makes. * * * *Any valid contract* between the payee and the principal, by which the terms of the original note are altered in any material particular * * * will vitiate the note as to him, if made without his consent."

In *Gardner v. Gardner*, 23 S. C., 588, it was held that: "The surety has a right to stand upon the contract as he made it; and if it is altered in any respect, it is no longer the contract which he made, and he cannot be held bound by it." (This demonstrates that there need not have been a *physical* alteration of the obligation; an agreement is sufficient.)

In 3d Story Eq. Jur. (14th Ed.), § 450, it is said: "It is upon this ground that if a creditor without any communication with the surety and assent on his part should afterwards enter into any new contract with the principal inconsistent with the former contract, or should stipulate in a binding manner upon a sufficient consideration for further delay and postponement of the day of payment of the debt, that will operate in equity as a discharge of the surety."

In *White v. Harris*, 69 S. C., 65, 48 S. E., 41, 43, 104 Am. St. Rep., 791, the Court said: "Whatever [physical alteration or agreement, I interpolate] changes the legal effect of the instrument is a material alteration."

It is declared in the opinion of Mr. Justice Carter that the cases of *Sloan v. Latimer, Harrell v. Parrott, Greenville v. Ormand, Sanders v. Bagwell,* and *Gardner v. Gardner,* cited and quoted from by me, *"are not in point."* I gather that the ground of *pointlessness* suggested is that in each of them there was a physical interference with the autonomy of the paper. That as I have endeavored to show is not at all necessary; the discharge of the secondary obligor is affected by a contractual alteration of the terms of the contract in a material particular, whether by spoliation, addition, alteration, memorandum, or separate agreement.

In reference to the claim of the plaintiff as a holder in due course, the Court declared in the case of *Bank v. Efird*, 91 S. C., 135, 74 S. E., 136, 137: "There can be no doubt that the erasure of those words was a material alteration of the note, which invalidated it even in the hands of an innocent holder. (Citing cases.) The general rule upon the subject is

thus expressed in 2 A. & E. Enc. L. (2d Ed.), p. 193: "So, where a promissory note is materially altered by the payee or transferee, not only is it vitiated and destroyed in the hands of the party responsible for the alteration, but there can be no recovery thereon against the maker, or any indorser prior to the one who is responsible for the alteration, by a person into whose hands it has come after the change was made, *even though he be a bona fide indorsee for value without notice of the alteration'* "—citing cases. This is particularly true in the present case where the plaintiff was a party to the material alteration.

It can make no difference that the agreement to increase the rate of interest was evidenced by a separate paper rather than by a physical alteration of the instrument.

It seems to me clear therefore that whether the mortgage be deemed satisfied by the conveyance by Ball to Dye and his assumption of the mortgage, or whether the mortgage was still kept alive and the alteration was made of the contract evidenced by the mortgage, the Cary defendants are forever discharged, and that it should be so held.